UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | 18 CR 185 |
| ) | |
| vs. ) | Judge Gary Feinerman |
| ) | |
| TOBIAS DIGGS, MARVON HAMBERLIN, and ) | |
| JOSHUA McCLELLAN, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Tobias Diggs and Joshua McClellan are charged by indictment with several offenses arising from their alleged involvement in the March 17, 2017 robbery of a Razny Jewelers store in Hinsdale, Illinois. Doc. 1. The court suppressed GPS location data tied to a Lexus SUV that, according to the Government, Defendants used to travel to and from the robbery. Docs. 77-78 (reported at 385 F. Supp. 3d 648 (N.D. Ill. 2019)). And the court declined to suppress other evidence—including data from McClellan's iPhone, information from Instagram and Facebook accounts believed to be associated with Diggs and McClellan, and evidence found in the Lexus SUV—that, according to Defendants, were the unlawful fruits of the GPS data. Docs. 116-117 (reported at 2020 WL 208826 (N.D. Ill. Jan. 14, 2020)). With Hamberlin a fugitive, Docs. 89-90, a jury trial for Diggs and McClellan is set for October 13, 2020. Doc. 136.

Presently before the court is the Government's motion to admit certain co-conspirator statements against Diggs and McClellan under Evidence Rule 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). Doc. 145. Also before the court is the parties' dispute over whether Diggs's spouse, Devinn Adams, may assert the spousal testimonial privilege at trial. *Id*. at 22 n.12; Doc. 154 at 11-15; Doc. 163 at 2-4. The Government's Rule 801(d)(2)(E)

1

motion is conditionally granted, subject to the introduction at trial of the evidence underlying its *Santiago* proffer, and Adams may not invoke the spousal testimonial privilege regarding events to which she was a percipient witness from March 17-23, 2017.

**Background**

Pertinent here, Count One of the indictment charges that, beginning around January 2017 and continuing through April 2017, Defendants conspired among themselves and with others to obstruct, delay, and affect commerce by robbery in violation of the Hobbs Act, 18 U.S.C. § 1951(a). Doc. 1 at 1-2. Specifically, Count One charges that Defendants and others: (1) agreed to rob the Razny Jewelers store; (2) planned the robbery by surveilling the store, communicating on their cell phones, and obtaining firearms; (3) executed the robbery by brandishing firearms, communicating on their cell phones, using a getaway vehicle, and hiding their identities; and (4) concealed their crimes by, among other things, hiding the getaway vehicle and selling some of the stolen goods in Illinois and Georgia. *Ibid*.

According to the Government, the evidence it proffers—including text messages, phone call logs, web search histories, and cell-site location information—shows that several other individuals were co-conspirators or joint participants in the charged conspiracy, making certain of their statements admissible against Defendants under Rule 801(d)(2)(E). Doc. 145 at 3-4. Among those statements are text messages obtained from McClellan's iPhone that were sent from January 2017 through March 2017 by Hamberlin, McClellan's brother ("Johnny" McClellan), a person called "James," and a person called "Kanaris." *Id*. at 14-22. Defendants stated at the motion hearing, Doc. 183, that they do not challenge the admissibility of those text messages, so the Government's motion is granted as to them.

Defendants object to the Government's motion insofar as it seeks to admit certain out-of-court statements by Adams. Doc. 154 at 7-11. The parties also dispute whether Adams—who married Diggs at some point after he was charged in this case—may invoke the spousal testimonial privilege at trial. Doc. 145 at 22 n.12; Doc. 154 at 11-15; Doc. 163 at 2-4. On both points, the Government proffers evidence intended to show that Adams—the Lexus SUV's registered owner and Diggs's then-girlfriend—agreed to help him conceal the Lexus and took steps to obtain a rental car that Defendants could use to travel to Atlanta, Georgia to sell the stolen items. Doc. 145 at 22-25; Doc. 163 at 4-10. The pertinent evidence is as follows.

The robbery took place just after 10:00 a.m. on March 17, 2017. Doc. 145 at 2-3; Doc. 154-1 at 1. At 3:08 p.m. that day, Diggs called Adams, who at the time was in Michigan with her mother and stepfather. Doc. 145 at 23; Doc. 154-1 at 6, 9. According to the statement she later gave to the Hinsdale police, Diggs told Adams on that call that he had just "hit a j-spot" or "busted a j-move" and that she needed to return to Chicago to pick up the Lexus because it was "heated up" and "all over the news." Doc. 163 at 6; Doc. 154-1 at 6-8. At 3:17 p.m., Adams began a series of text messages with her stepfather. Doc. 145 at 23. In the first message, Adams asked, "what time ru getting off work today." *Ibid*. While awaiting his response, Adams called Diggs. *Ibid*. Her stepfather later responded, "I just got done," and Adams replied, "do u think you could run us back possibly." *Ibid*. Her stepfather responded that he had experienced a "rough one at work today" but that "tomorrow [he] could." *Ibid*. Adams called Diggs about ten minutes later, and then Diggs called Adams. *Ibid*. Adams later told the police that, at some point during their phone calls, Diggs told her not to worry about the Lexus because "someone was going to take care of it." Doc. 163 at 7; Doc. 154-1 at 7-8. At 4:44 p.m., video surveillance

3

captured "Individual B" parking the Lexus in a hospital parking lot. Doc. 163 at 7. The Lexus ultimately was recovered from Individual B's garage. *Id*. at 7 n.5.

The next day, March 18, Adams conducted a web search on her phone for details about the Razny Jewelers robbery. Doc. 145 at 23-24. At 11:25 a.m., she received a text message from her mother. *Ibid*. The message stated: "Dad said he can take you home in about an hour or he can take you tomorrow [March 19] … or I can take you Tuesday [March 21]." *Id*. at 24. About 20 minutes later, Adams and Diggs had three calls that lasted 11 seconds, 22 seconds, and 15 minutes. *Ibid*.

Adams and Diggs again spoke by phone at 8:50 p.m. on March 18. *Ibid*. About thirty minutes later, Adams began web searches on her phone for "no credit card car rental," Budget car rental reservations, and "south bend regional airport budget car rental." *Ibid*. During the web searches, Adams called the phone number for a Budget facility in South Bend, Indiana. *Ibid*. After the web searches, she called the general customer service line for Budget and phoned Diggs immediately thereafter. *Ibid*. At 10:01 p.m., McClellan received a text message from "Johnny" stating, "We gone move out in a couple of hours." Doc. 163 at 9. McLellan texted "Johnny" back at 10:27 p.m. to let him know that "everything is good with the whip [car]." *Ibid*.

Adams agreed to speak with the Hinsdale police on March 23. *Id*. at 4; Doc. 154-1 at 6. During the first hour, Adams pretended to know nothing about the robbery. Doc. 163 at 4-5. She told the police that she had been in Michigan for the last eight days, that her Lexus had broken down a few days before she left Chicago for Michigan, and that Diggs had told her that the Lexus was in the shop being fixed. *Id*. at 5. When pressed further, Adams added that she did not know where her vehicle was or when she expected it to be repaired. *Ibid*. Eventually, Adams admitted to the police that she knew about the robbery. *Ibid*. She explained that she had

4

asked her stepfather to give her a ride to Chicago after receiving a call from Diggs telling her to come to Chicago retrieve her Lexus because it was on the news. *Ibid.*; Doc. 154-1 at 6.

The following day, March 24, Adams again met with the Hinsdale police and gave them permission to download the contents of her phone. Doc. 163 at 6; Doc. 154-1 at 6-7. The Hinsdale police conducted a follow-up interview with Adams on March 26. Doc. 154-1 at 7-8. She recounted the same narrative from March 23 and added that, before Diggs asked her to return to Chicago to get her Lexus, he remarked that he had "hit a j-spot" or "busted a j-move" while speaking quickly and whispering. *Ibid.*; Doc. 163 at 6.

About two weeks later, on April 4, Adams called Headers Auto Sales—which had sold her the Lexus on credit—to report that it had been stolen. Doc. 145 at 24. As of March 2017, Adams was still making weekly payments on the vehicle. *Ibid.* When a Headers employee asked her for a police report, Adams said that she would have to call back. *Id.* at 24-25.

Adams appeared by subpoena before the grand jury on December 7, 2017. Doc. 163 at 6; Doc. 154-2. She testified that Diggs called her the day of the robbery to tell her that he had "busted a j-move," that her Lexus was on the news, and that she needed to return to Chicago. Doc. 163 at 7; Doc. 154-2 at 11. Adams also testified that she then called her cousin to ask for a ride to Chicago and began calling rental car businesses. Doc. 163 at 7; Doc. 154-2 at 12. Adams added that her cousin "didn't answer and then [she] kind of sat down for a second and realized that [going to Chicago] was not a good idea." Doc. 154-2 at 12.

## Discussion

### I. Rule 801(d)(2)(E) Motion

Rule 801(d)(2)(E) provides that an out-of-court statement "offered against an opposing party" is not hearsay if it was "made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To invoke the Rule in a criminal case, the Government

5

must "prove[] by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy." *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010). "Under long-settled circuit law, a district court may admit co-conspirator statements conditionally based on the government's pretrial proffer, known in this circuit as a '*Santiago* proffer.'" *United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016) (citing *United States v. Santiago*, *supra*). "If at the close of its case the prosecution has not met its burden to show that the statements are admissible, the defendant can move for a mistrial or to have the statements stricken." *United States v. Haynie*, 179 F.3d 1048, 1050 (7th Cir. 1999).

      To satisfy the first two requirements of Rule 801(d)(2)(E)—that a conspiracy existed, and that the defendant and the declarant were members of the conspiracy—the Government must prove, and the court must find under Rule 104, that the defendant and the declarant were either co-conspirators or joint participants in a criminal venture. *See United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989). "Rule 801(d)(2)(E) applies not only to conspiracies but also to joint ventures, and … a charge of criminal conspiracy is not required to invoke the evidentiary rule." *Ibid*. In deciding whether the Government has met its burden, "a district court is allowed to consider the statements themselves as evidence of the conspiracy," *United States v. Harris*, 585 F.3d 394, 398 (7th Cir. 2009) (citing *Bourjaily v. United States*, 483 U.S. 171, 180 (1987)), but "the record must also contain independent evidence corroborating the existence of the conspiracy and the participation of defendant and declarant," *Davis*, 845 F.3d at 286. *See* Fed. R. Evid. 801(d)(2) ("The [out-of-court] statement must be considered but does not by itself establish … the existence of the conspiracy or participation in it under (E).").

6

The evidence required to prove by a preponderance of the evidence the first two requirements of Rule 801(d)(2)(E) need not rise to the level of "what must be proved [beyond a reasonable doubt] in order to convict a person of the crime of conspiracy." *United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979). There nonetheless is some conceptual overlap between substantive conspiracy law and Rule 801(d)(2)(E) as it pertains to those two requirements. *See United States v. Arrellano*, 757 F.3d 623, 634 (7th Cir. 2014) (holding that the Government "met its burden under the lesser preponderance standard" to show the defendant's membership in a conspiracy under Rule 801(d)(2)(E) given that it had proved beyond a reasonable doubt the defendant's guilt of engaging in the conspiracy). For one, "to be a member of a conspiracy, a person does not need to know or participate in every detail of the conspiracy, or to know all the conspiracy's members." *United States v. Sophie*, 900 F.2d 1064, 1080 (7th Cir. 1990). Moreover, membership in a conspiracy or joint venture may be proved by either direct or circumstantial evidence. *See Davis*, 845 F.3d at 288 (relying on circumstantial evidence to show membership in and existence of a conspiracy under Rule 801(d)(2)(E)); *see also United States v. Pust*, 798 F.3d 597, 603 (7th Cir. 2015) ("[C]ircumstantial evidence is often the only proof available when no members of the conspiracy testify against their co-conspirators.").

As for Rule 801(d)(2)(E)'s third requirement—that the out-of-court statement be made during the course and in furtherance of the conspiracy—the Government must prove, and the court must find under Rule 104, "some reasonable basis … for concluding that the statement furthered the conspiracy." *Cruz-Rea*, 626 F.3d at 937 (internal quotation marks omitted). The statement "need not have been exclusively, or even primarily, made to further the conspiracy," and may be admitted even if it "is susceptible to alternative interpretations." *Ibid*. (internal quotation marks omitted). Generally, any statement that is "part of the information flow between

conspirators intended to help each perform his role" will satisfy the requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (internal quotation marks omitted). "Some examples include comments designed to assist in recruiting potential members, to inform other members about the progress of the conspiracy, to control damage to or detection of the conspiracy, to hide the criminal objectives of the conspiracy, or to instill confidence and prevent the desertion of other members." *United States v. Elder*, 840 F.3d 455, 459 (7th Cir. 2016) (quotation marks omitted).

As noted, Defendants oppose the Government's Rule 801(d)(2)(E) motion only insofar as it seeks admission of Adams's out-of-court utterances. As an initial matter, much of what the Government seeks to admit would not qualify as hearsay even putting aside Rule 801(d)(2)(E). Rule 801(c) defines "hearsay" to mean "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Rule 801(a) defines "statement" to mean "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). Thus, an utterance that is not an assertion is not a statement and thus is not hearsay, and the same holds for a statement that is an assertion but that the Government does not offer to prove the truth of the matter asserted in the statement.

The Government seeks to offer into evidence Adams's phone call logs, her phone's web search history, her text messages to her stepfather, and her statement to Headers that the Lexus had been stolen. Doc. 145 at 24-26. The phone call logs and web search history plainly are not "statements" under Rule 801(a), so they are not hearsay. *See United States v. Wallace*, 753 F.3d 671, 675 (7th Cir. 2014) (holding that a videotape of an attempted drug buy was not a "statement" within the meaning of Rule 801(c)). The same is true of Adams's statement to

8

Headers that her Lexus had been stolen, as the Government plans to offer the statement not for its truth, but rather to show that Adams was lying. *See United States v. Porter*, 886 F.3d 562, 567 (6th Cir. 2018) ("[S]tatements that are offered to prove the *falsity* of the matter asserted are not hearsay."); *United States v. Costa*, 31 F.3d 1073, 1080 (11th Cir. 1994) (same); *United States v. Moore*, 748 F.2d 246, 248 (5th Cir. 1984) (same).

That leaves Adams's two March 17 text messages to her stepfather: "what time ru getting off work today," and "do u think you could run us back possibly." Doc. 145 at 23. Both messages ask questions. In *United States v. Love*, 706 F.3d 832 (7th Cir. 2013), the Seventh Circuit held "that questions are not 'statements' [under Rule 801(a)] and therefore are not hearsay." *Id*. at 840 (citing *United States v. Thomas*, 453 F.3d 838, 845 (7th Cir. 2006)). Last month, however, the Seventh Circuit adopted a more nuanced approach, "elaborat[ing] on what makes a remark a question rather than a statement." *United States v. Pulliam*, __ F.3d __, 2020 WL 5247590, at *6 (7th Cir. Sept. 3, 2020). As the Seventh Circuit explained, "[a] defendant's remark is a question if it is designed to elicit information and a response," but "[i]f the remark is intended to assert information, it is a statement rather than a question." *Ibid*. (internal quotation marks and citations omitted). And the Seventh Circuit added that "the intent behind a remark dictates whether it is a statement or a question for hearsay purposes," and that "the context surrounding the remark may help … ascertain the declarant's intent." *Ibid*.

Adams's remark, "what time ru getting off work today," was designed to elicit information and a response, meaning that it was a question, not an assertion, which in turn means it is not hearsay. Adams's remark, "do u think you could run us back possibly," presents a closer call, as it appears to be both an assertion ("I intend to return to Chicago") and a question designed to elicit information and a response ("Can you give me a ride back to Chicago"). It is

9

unnecessary to run this issue to ground, for even if that remark were an assertion and thus a statement, it is not hearsay under Rule 801(d)(2)(E).

As to the Rule's first two requirements, the Government correctly submits that the proffered evidence shows that Adams made herself a co-conspirator by attempting to "assist Diggs in concealing the Lexus and securing a rental car to travel to Atlanta." Doc. 163 at 4-10; Doc. 145 at 22-25. As to concealing the Lexus, the evidence shows that within minutes of Diggs telling her on March 17 that he had just "hit a j-spot" and needed her to come to Chicago to pick up the vehicle, Adams initiated a text chain with her stepfather in which she asked him, "what time r u getting off work today," and, "do u think you could run us back possibly." Doc. 145 at 23; Doc. 154-1 at 6, 7-8. Adams and Diggs's other March 17 phone calls were very close in time to her texts to her stepfather. Doc. 154-1 at 9. She called Diggs after asking her stepfather when he would get off work, phoned Diggs again ten minutes after her stepfather turned down her request for a ride that day to Chicago, and then received a return call from Diggs. *Ibid.*; Doc. 145 at 23. Indeed, after coming clean on March 23, Adams told the Hinsdale police that she had asked her stepfather to give her a ride to Chicago after Diggs asked her to retrieve the Lexus. Doc. 154-1 at 6-8. Taken together, this evidence shows by (at least) a preponderance of the evidence that Adams agreed to help Diggs conceal the Lexus and took steps to follow through. *See Davis*, 845 F.3d at 288 (relying on the fact that the defendant and the declarant had "multiple phone conversations" on the day the crime was planned as "additional circumstantial evidence" tying them to the conspiracy).

Defendants retort that Adams's actions on March 17 cannot show that she joined the conspiracy because there no is no direct evidence that she facilitated the robbery's concealment. Doc. 154 at 2, 10. As Defendants see it, all Adams did in response to Diggs's request to retrieve

10

the Lexus was "send a single text," and she did not ultimately retrieve the vehicle. *Id*. at 10. The trouble with Defendants' position is two-fold. First, "[t]he fact that much of [the Government's] evidence is circumstantial is beside the point" under Rule 801(d)(2)(E). *United States v. Kaden*, 819 F.2d 813, 819-20 (7th Cir. 1987) (affirming the district court's granting the Government's Rule 801(d)(2)(E) motion based on circumstantial evidence of the conspiracy's existence and the defendant's and the declarant's participation therein). Second, a person's membership in a conspiracy is not judged by her success in achieving the conspiracy's objectives. *See United States v. Schmucker-Bula*, 609 F.2d 399, 401 (7th Cir. 1980) ("[I]t is an elementary principle of conspiracy law that the criminal venture need not succeed for there to be criminal liability."). Indeed, the proffered evidence shows that Adams did not retrieve the Lexus because Individual B—who was captured on video that afternoon parking the Lexus behind a hospital—undertook the task. Doc. 163 at 7. Confirming the point, Adams later told the Hinsdale police that Diggs had told her that "someone was going to take care of [the Lexus]," and the vehicle later was found in Individual B's garage. *Id*. at 7 & n.5; Doc. 154-1 at 7-8.

The Government's proffered evidence—specifically, Adams's March 18 calls to Budget, web searches for Budget and "no credit card car rental," and contemporaneous calls with Diggs—also shows that she agreed to help secure a rental car for Diggs and the others to drive to Atlanta to sell the stolen goods and took steps to accomplish that goal. Adams began her web search thirty minutes after speaking with Diggs and phoned him almost immediately after she finished a call with Budget. Doc. 163 at 8. Contrary to Defendants' submission, it is highly unlikely that Adams conducted the web searches and called Budget to find a car to drive back to Chicago because, several hours earlier, her mother had texted to tell her that her stepfather could

11

give her a ride back to Chicago that day or the following day, and that her mother could give her a ride in three days. *Ibid*.

Defendants respond that Adams cannot have been a co-conspirator because the Government did not charge her with any crimes, she cooperated with the Hinsdale police and appeared before the grand jury, and she testified to the grand jury that her rental car inquiries were for the purpose of exploring "ways to get back to [Chicago]." Doc. 154-2 at 12. Those arguments fail. The Government need not "*charge* a conspiracy" in order to invoke Rule 801(d)(2)(E). *United States v. Reynolds*, 919 F.2d 435, 439 (7th Cir. 1990). Although Adams ultimately assisted with the investigation, the fact that she initially denied knowledge of the robbery and falsely claimed that her Lexus was "broken" strongly suggests that she was in on the conspiracy and that her grand jury testimony regarding the purpose of her rental car inquiries was untruthful or the product of confusion. *See United States v. Hunte*, 196 F.3d 687, 691 (7th Cir. 1999) (finding sufficient evidence of the defendant's participation in a drug transportation conspiracy based in part on his "lying to police about [the group's] destination and about [its] association with [other co-conspirators]"); *United States v. Lindemann*, 85 F.3d 1232, 1240 (7th Cir. 1996) (holding that the defendant was a co-conspirator under Rule 801(d)(2)(E) because the fact that he "intentionally lied, and ordered his employees to lie, to insurance investigators" made it "more likely than not that [he] was involved in the fraud") (internal quotation marks omitted).

Given all this, the court finds by a preponderance of the evidence that Adams conspired with Defendants, at least during the March 17-23 time frame, to conceal an instrumentality of the crime (the Lexus) and to find them a car to take the stolen goods to Atlanta. The court also finds by a preponderance of the evidence that Adams's remark, "do u think you could run us back possibly," was made in furtherance of that conspiracy. *See United States v. Gajo*, 290 F.3d 922,

12

928-29 (7th Cir. 2002) (holding that co-conspirator statements made "to avoid detection" by law enforcement were properly admissible under Rule 801(d)(2)(E) as statements "in furtherance"); *Kaden*, 819 F.2d at 820 (holding under Rule 801(d)(2)(E) that statements evidencing a co-conspirator's "attempt to conceal the fact that he was involved in starting the fire" were made in furtherance of an arson conspiracy); *United States v. Skidmore*, 254 F.3d 635, 637-39 (7th Cir. 2001) (upholding the admission under Rule 801(d)(2)(E) of a co-conspirator's statement to the secretary of a gun shop that she purchased firearms on the defendant's behalf because the defendant had been in prison). That remark, even assuming it is a statement and not a question, is therefore conditionally admitted under Rule 801(d)(2)(E).

## II. Adams's Invocation of the Spousal Testimonial Privilege

"There are two distinct marital evidentiary privileges under federal law: the marital communications privilege and the adverse spousal testimonial privilege." *United States v. Brock*, 724 F.3d 817, 820 (7th Cir. 2013). The marital communications privilege "covers information privately disclosed between husband and wife in the confidence of the marital relationship." *Ibid*. (internal quotation marks omitted). That privilege does not apply to communications between Diggs and Adams during the January-March 2017 time frame because the pair did not marry until after Diggs was charged in March 2018.

That leaves the adverse spousal testimonial privilege, which Adams intends to invoke to avoid testifying in any way against Diggs. Doc. 154 at 11 n.3. That privilege, which is broader than the marital communications privilege, provides that a witness cannot be compelled to testify against the person to whom she is married at the time of trial. *See United States v. Byrd*, 750 F.2d 585, 590 (7th Cir. 1984). "[S]hould the witness-spouse assert it, [the privilege] applies to all testimony against a defendant-spouse, including testimony on nonconfidential matters and matters which occurred prior to the marriage." *Ibid*. "The modern justification for this privilege

13

… is its perceived role in fostering the harmony and sanctity of the marriage relationship." *Trammel v. United States*, 445 U.S. 40, 44 (1980).

To defeat Adams's assertion of the privilege, the Government invokes the "joint participants" exception, which applies where the witness-spouse and the defendant jointly participated in the criminal conduct at issue. *See United States v. Van Drunen*, 501 F.2d 1393, 1397 (7th Cir. 1974). Defendants contend that *Van Drunen*, in which the Seventh Circuit articulated the exception, did not survive the Supreme Court's 1980 decision in *Trammel*. Doc. 154 at 11-14. But the Seventh Circuit has applied and reaffirmed the joint participants exception in the years following *Trammel*. *See United States v. Keck*, 773 F.2d 759, 767 (7th Cir. 1985) (applying the exception to defeat assertion of the privilege); *Byrd*, 750 F.2d at 594 (recognizing that "the testimonial privilege do[es] not apply to communications made by spouses who are joint participants in a crime"); *United States v. Clark*, 712 F.2d 299, 301 (7th Cir. 1983) (addressing *Trammel* and "reject[ing] the holding of the Third Circuit that there should not be a joint participants exception to the privilege not to testify against a spouse"); *see also United States v. Pineda-Mateo*, 905 F.3d 13, 17 (1st Cir. 2018) ("[T]he Seventh Circuit continues to recognize such an exception even after the Supreme Court's decision in *Trammel*."). That ends the matter as far as a district court is concerned. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) ("Just as the court of appeals must follow decisions of the Supreme Court whether or not we agree with them, so district judges must follow the decisions of [the Seventh Circuit] whether or not they agree."); *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 687 (7th Cir. 2002) ("[O]nly an express overruling relieves an inferior court of the duty to follow decisions on the books.").

14

The evidence showing that Adams was a co-conspirator for purposes of Rule 801(d)(2)(E) shows in equal measure that she was a joint participant in Diggs's criminal conduct for purposes of defeating her assertion of the spousal testimonial privilege. *See Keck*, 773 F.2d at 756-57 (holding that the spousal testimonial privilege did not apply where both spouses were "joint participants" in a drug-trafficking conspiracy); *Clark*, 712 F.2d at 300-302 (applying the joint participants exception to defeat the assertion of the privilege where both spouses stole money from a savings and loan). Adams therefore must testify about events that occurred while she was a joint participant. She became a joint participant on March 17, when, after Diggs told her about the robbery, she sought to assist him with concealing the Lexus and finding a rental car for him to travel to Atlanta. In the Government's view, Adams continued to be a joint participant as late as April 4, when she told Headers that the Lexus had been stolen. Doc. 145 at 24-25. But as Defendants correctly note, Adams on March 23 told the Hinsdale police that Diggs had used her car in connection with the robbery. Doc. 154-1 at 6. By engaging in the "affirmative act" of "confessing to [the] authorities," *United States v. Maloney*, 71 F.3d 645, 654-55 (7th Cir. 1995), Adams withdrew from the criminal enterprise on March 23. Accordingly, Adams may be compelled to testify about events to which she was a percipient witness from March 17-23, 2017, the time frame during which she was a joint participant.

## Conclusion

The Government's Rule 801(d)(2)(E) motion is conditionally granted, and Adams may not invoke the spousal testimonial privilege regarding events to which she was a percipient witness from March 17-23, 2017.

October 2, 2020

_____
United States District Judge