## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 18 Cr 185-1 |
| | ) | |
| | ) | Hon. Gary Feinerman |
| Tobias Diggs, | ) | |
| Defendant. | ) | |

### DEFENDANT DIGGS'S SENTENCING MEMORANDUM

Defendant Tobias Diggs, through his undersigned attorney, submits this Sentencing Memorandum to supplement the PSR, object to its advisory guidelines calculations, and analyze the factors that must be used to determine the appropriate sentence under 18 U.S.C. § 3553(a). Counsel respectfully submits that a sentence substantially below the low-end of the corrected advisory guideline range is sufficient but not greater than necessary to advance the statutory purposes of sentencing set forth in § 3553(a), and therefore requests that the Court impose such a sentence.

**I.     Factual Supplement to the PSR**

The PSR, which was prepared in December 2020, recounts the exceptionally tragic events that Tobias and his family suffered during Tobias's formative adolescence. Tobias grew up one of nine children raised by a single mother in an impoverished and violent neighborhood on Chicago's south side. His father was absent and struggled with substance abuse. (PSR ¶¶86-87.) Within a single year, when Tobias was fourteen years old, he lost his two oldest siblings to tragic gun

violence. His oldest brother, Cordero Diggs, was shot and killed in 2007, and his next oldest brother, Sylvester Porch, was shot and killed in 2008. (PSR ¶¶89-90.)

As one would expect, the senseless killings of his two older brothers had a profoundly traumatic effect on Tobias. In the immediate aftermath of the first murder, Tobias obtained a gun for the purpose of killing himself. (PSR ¶103.) Thankfully, a relative intervened before Tobias could take his own life, but his brothers' murders took an enormous toll on Tobias over the ensuing months and years. In the wake of the killings, Tobias temporarily dropped out of school, abandoned his dreams of playing professional football, and began using illegal drugs. (PSR ¶¶90, 110.) He also began acting out, which caused him to be admitted to the Hartgrove Hospital in Chicago for "behavioral problems," and soon led to his first interaction with the criminal justice system when he was arrested the following year for unlawful possession of a weapon as a fourteen-year-old. (PSR ¶¶68, 104.)

Since the preparation of the PSR, Tobias and his family have suffered yet another tragic loss. In March of last year, Tobias's next oldest brother, Stefan Porch, was killed when he was runover by a semi-truck while he was attending to his car on the side of a highway. Stefan's death announcement is attached as Exhibit 1. Stefan was 25 years-old at the time of his death, only one year younger than Tobias. Stefan was Tobias's closest friend, with whom he shared a passion for music. This additional loss was exceptionally painful to Tobias, particularly because he was not able to participate in services to honor or say goodbye to Stefan due to his current

incarceration.[1] Tobias is now 28 years-old, and he has lost each of his three oldest and closest siblings in tragic fashion.

Counsel also seeks to supplement the facts set forth in the PSR with the letters from Tobias's family and friends that are attached collectively as Exhibit 2. These letters make clear that Tobias has always had a remarkably warm and generous spirit, and that he has been a loving and supportive family member. But, like the PSR, these letters also highlight how profoundly his brothers' tragic murders impacted Tobias, derailed his development, and ultimately led him to the violent behavior that brought him before the Court. Finally, through their insight into Tobias's journey, these letters provide promise and reassurance into his potential and likely behavior upon release from prison.

According to family members, Tobias was a "great kid" and "stellar athlete" growing up who "took refuge from the means streets of his neighborhood by focusing on sports." (Ex. 2, at 1-2.) He "was one of those happy go lucky kids always smiling, very respectful and always kidding around." (*Id.* at 2.) "While most teens his age were running the streets, Tobias was [at a youth development program] learning character development, writing down his goals and performing his newest songs for the crowd." (*Id.* at 10.)

Everything changed, however, when Tobias's two older brothers were tragically shot and killed when Tobias was a young teenager. Tobias' "life was upended when his [first] brother was murdered," and then after his second brother

---

[1] Defendant filed a motion for temporary release to allow him to attend the services, but that motion was denied. (Dkt. 260, 264.)

3

was killed the following year "Tobias went into a deep depression and dropped out of school in search of himself," and abandoned his dreams of playing professional football. (Ex. 2 at 1; PSR ¶¶90-91.) Following the murders, his entire family was reeling, and "no one could really help each other cope with these deaths." (Ex. 2, at 2.)

Tobias's loss was compounded by the fact he suddenly became the oldest of seven siblings, with brothers and sisters "to take care of that looked up to him," which brought "a lot of pressure [and] grief." (*Id.* at 2, 6.) A member of a community service organization who worked with Tobias at that time observed that "I really don't think Tobias had time to mourn or grief the tragic death of his two oldest brothers. Because from that point on, he took on the responsibility of now being the oldest and became even more driven of making a pathway out of poverty so his family could live in a loving, stable, and safe environment." (*Id.* at 9-10.)

This combination of loss and grief and pressure took an enormous toll on Tobias. As noted above, he was suicidal, dropped out of school, abandoned his football dreams, began using drugs, and began engaging in criminal activity, and he also struggled with hallucinations that included conversations with his deceased brother. (PSR ¶¶68, 104, 106, 110.) Eventually, Tobias turned to music "to express his anger, his fears and his feelings of misunderstandings about people like him," and he sought to use music as a route to success and a means to support his family. (Ex. 2 at 1.)[2]

---

[2] Tobias's pain and sense of injustice were further aggravated by the fact that the killer of his next oldest brother received a sentence of only five years for that offense.

4

During this time, however, Tobias struggled with anxiety, depression, and drug and gambling addictions, which combined to cause further financial stress and pressures. (PSR ¶¶107, 110). These issues were compounded when in late 2016 Tobias became a father to two young daughters born to different mothers within weeks of one another. With the arrival of those daughters, Tobias became "afraid of providing for them," and found himself "[d]esperate with not enough resources," and these fears and pressures ultimately culminated in Tobias making terrible and self-destructive decisions that led to jail and brought him before the Court. (Ex. 2, at 1.)

Notwithstanding the violent acts that he committed during this turbulent period, Tobias is not, at his core, a violent person. His past violent acts were the product of his past trauma, his stresses, his addictions, and the violent circumstances and individuals he was surrounded by during that time. Throughout and notwithstanding his struggles, the essence of Tobias's character has remained present and apparent to his family, who attest that he has "always been a loving and caring person," and he has always tried to maintain "a happy spirit [that] puts a smile on everyone in the room." (*Id.* at 4.).

The attached letters uniformly describe Tobias as a warm and genuine and caring person:

- "Tobias is special and has a way of shining a light into a dark room."
- He "makes every one around him laugh and smile even if you were mad or sad."
- He is "always full of light and could shine it on anyone in the room"
- He is "full of energy and love"

5

- "He is creative, loving and compassionate. He is loyal."
- "He was sweet, Family oriented, very funny"
- He is "compassionate brother, loyal friend, talented artist, dedicated father, and loving son."

Of course, the testimony the Court heard regarding the robbery is drastically inconsistent with these descriptions. But these descriptions speak to the innate and genuine character of Tobias that was there before his brothers were murdered and his downward spiral began, and that will be there when he is released from prison. That is because, at bottom, Tobias "is a kind hearted person with a very strong personality with the desire for self improvement." (*Id.* at 4.) "He is talented, personable and he loves his family," (*id.* at 1), and he has demonstrated through his desire for counseling and self-improvement while incarcerated that he has a promising and productive future ahead. He has strived to develop the skills he lacked during the period leading up to the offense and that he will need upon release. He has sought out and participated in treatment for his gambling and drug addictions, and he has also taken GED classes and classes in parenting, anger management, cognitive thinking, and stress management. (PSR ¶¶107, 112, 116.)

## II. Objections to the PSR's Advisory Guidelines Calculations

Defendant respectfully objects to the PSR's recommendations that he receive enhancements for abduction of a victim under § 2B3.1(b)(4)(A) and the use of body armor under § 3B1.5(2)(B) because neither enhancement is supported by the evidence in this case.

6

### A. The Four-Point Abduction Enhancement Does Not Apply.

In accord with the government's recommendation, the PSR recommends a 4-point enhancement under § 2B3.1(b)(4)(A) based on its finding that while attempting to leave the scene, "Diggs and his confederates forcibly took [a Starbucks employee] outside of the building which housed Razny Jewelers and Starbucks and did so while pointing a firearm at [the employee]." (PSR ¶30; GV at 10-11.) The undisputed purpose of this restraint was to obtain directions to get out of the building, and upon exiting the building the offenders "placed [the employee] on the ground face down, and then fled." (PSR ¶30.) The PSR contends "that said conduct entails abduction" and therefore recommends the 4-point enhancement under § 2B3.1(b)(4)(A). (*Id.*) Defendant submits that these facts are not sufficient to trigger this four-point "abduction" enhancement under the plain instructions of the advisory guidelines and the governing law of the Seventh Circuit. The recommended enhancement should therefore be overruled.[3]

The advisory guidelines define "abducted" to mean "that a victim was forced to accompany an offender to a *different location,*" such as if "a bank robber forc[es] a bank teller from the bank *into a getaway car.*" U.S.S.G. § 1B.1, App. Note 1(A) (emphases added). Likewise, the guidelines commentary emphasizes that the abduction enhancement only applies to when "a victim was forced to accompany the defendant to *another location.*" U.S.S.G. § 2B3.1 Background Commentary (emphasis added). "Location" is generally defined to mean "a position or site occupied or

---

[3] Defendant does not contest that he would be subject to a two-point enhancement under § 2B3.1(b)(4)(A) for use of physical restraint in the event the four-point abduction enhancement is correctly rejected.

7

available for occupancy or marked by some distinguishing feature." *See* [https://www.merriam-webster.com/dictionary/location](https://www.merriam-webster.com/dictionary/location).

As the Court will recall, the physical restraint in this case occurred in a single building and in a single hallway of that building that was used to take out trash, it lasted well less than a minute, and it was applied only for the purpose of obtaining directions to an immediate exit from that single building. (Tr. 378-82;GX 001-5.) In this case, the restraint was used for the purpose of identifying an exit from a *single location*, and the victim was not transported from that location to any other. Under these circumstances, the PSR's predicate conclusion that "the victim was forced accompany an offender to *a different location*" is incorrect, and the recommended enhancement should therefore be overruled.

Governing case law from the Seventh Circuit confirms that the abduction enhancement does not apply under these circumstances. In *United States v. Eubanks*, 593 F.3d 645 (7th Cir. 2010), the court reversed a district court's application of the abduction enhancement because the physical restraint was not used to move a victim from building to another, and it emphasized that "transporting the victims from one room to another is simply not enough for abduction." *Id.* at 654. In that case, the defendants used physical restraint in two different robberies. In the first robbery, they "forced an employee to the back of the beauty supply store to retrieve a surveillance video," and in the second robbery "the victim was dragged about six feet, from the back room of the store to the front room." *Id.* at 648, 652.

The Seventh Circuit concluded that the application of the abduction enhancement under those circumstances was "not supported by this Circuit's case

8

law," because those prior cases established that forced movement of a victim within or through a single structure amounts only to physical restraint within the meaning of § 2B3.1(b)(4)(B) and does not constitute abduction under § 2B3.1(b)(4)(A). *Id.* at 652-54; *see also United States v. Carter,* 410 F.3d 942, 954 (7th Cir. 2005) (forcible movement of a bank employee from one area of the bank (the vault) to another area of the bank (teller drawer) amounts to physical restraint withing the meaning of § 2B3.1(b)(4)(B)); *United States v. Doubet*, 969 F.2d 341, 346-47 (7th Cir. 1992) (forcing bank employees "to retreat to the room at the rear of the bank" amounts to physical restraint under § 2B3.1(b)(4)(B)).[4]

The Seventh Circuit's decision in *Eubanks*, and the cases cited therein, preclude the application of the abduction enhancement in this case because the victim, over less than a minute, was directed through a single hallway, and was not moved from one location to another. The proposed enhancement should therefore be overruled.

### B. The Body Armor Enhancement Does Not Apply.

The PSR also recommends a two-point enhancement under § 3B1.5(2)(A) because it deemed the "observations and perceptions of the security guard" who purportedly felt what the government contends is body armor to be reliable and

---

[4] In each of the cases in which the Seventh Circuit has upheld the application of the abduction enhancement, the victim was forced to enter *into a separate structure. See United States v. Anderson*, 484 F. App'x 65, 68 (7th Cir. 2012) (enhancement applied when "the defendant forced a bank employee at gunpoint to open a locked outside door and accompany *him into and around the ban*k") (emphasis added); *United States v. Davis*, 48 F.3d 277, 279 (7th Cir. 1995) (same); *United States v. Taylor*, 128 F.3d 1105, 1110 (7th Cir. 1997) (enhancement applied because "one of the defendants forced [a bank employee] at gunpoint to go from the parking lot *into the bank*") (emphasis added).

9

because the case agent relayed to the probation office that a "witness in this case has reported that she was present, along with Tobias Diggs, when an alleged confederate purchased body armor." (PSR ¶35.) The PSR's recommendation should be overruled because the government has failed to establish that "body armor," as that term is expressly defined in § 3B1.5(2)(A) and 18 U.S.C. § 921(a)(35), was used in the offense.

The Guidelines provide a precise definition of "Body armor." It is defined to mean "any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment. *See* 18 U.S.C. § 921(a)(35)." U.S.S.G. § 3B1.5 App. Note 1. The requirement that the product was "sold or offered for sale in interstate or foreign commerce" is a necessary and material element of that definition, *see Alderman v. United States*, 562 U.S. 1163 (2011) (Thomas, J., dissenting from the denial of *certiorari* and discussing the commerce nexus requirement), and it cannot be simply ignored.

Because the government is the party seeking this enhancement, it bears the burden of proving the facts necessary to establish the enhancement with specific and reliable evidence. *See United States v. White*, 883 F.3d 983, 988 (7th Cir. 2018) ("As a general rule, the government must show an aggravating offense characteristic under the Guidelines by a preponderance of the evidence"); *United States v. Schroeder*, 536 F.3d 746, 753 (7th Cir. 2008) ("As an initial matter, it is important to note that matters of doubt regarding the factual basis for enhancements should be construed in defendant's favor."); U.S.S.G. Chapter Six Introductory Commentary ("Reliable

fact-finding is essential to procedural due process and to the accuracy and uniformity of sentencing."). The cited testimony and witness statement are insufficient to satisfy the government's burden of establishing that one of the offenders was wearing "body armor" as defined by the guidelines and statute.[5]

No body armor was ever recovered from the vehicle used in the robbery or from any of the offenders. In short, there is no evidence as to what type of vest, if any, may have been worn by the tackling offender who made contact with the security guard, or whether it was "sold or offered for sale, in interstate or foreign commerce." The only testimony on this point was that of the security guard, who testified that "I believe the guy that was initially tackling me, as we're going backwards, had *some* type of vest *or* body armor as well because I was wearing my vest; and I grabbed on to him as we were going backwards, and I felt what I *believed to be a vest*." (Tr. 333 (emphasis added).)

Although the prosecutor asked this witness for a definition of body armor, the prosecutor never asked the witness what he meant when he said the offender was wearing a "vest." (*Id.*) While the witness may have believed he felt a vest, the government has not established that any such "vest" was "a product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering" as

---

[5] The government does not contend that the offender who tackled the security guard and was purportedly wearing the "vest" was Defendant. Accordingly, the contention in its version (GV at 11) that Defendant should receive a four-level enhancement under § 3B1.5(2)(B) is meritless. *See United States v. Haynes*, 582 F.3d 686, 711 (7th Cir. 2009) ("Section 3B1.5(2)(A) applies when the *offense* involved the use of body armor, for example, when a codefendant used body armor. Section 3B1.5(2)(B), however, applies when the *defendant* himself used body armor. There is nothing ambiguous about (2)(A) and (2)(B) when read together; the two subsections are quite different.") (emphasis in original). Because the government is only contending a codefendant used the body armor, § 3B1.5(2)(B) has no relevance to this case.

11

plainly required by § 3B1.5. Nor is there any such evidence anywhere else in the record in this case.

The cited witness statement relied on by the PSR likewise cannot be used to establish that the referenced "vest" amounted to body armor, as defined by the guidelines and statute. First, the referenced witness statement relayed by the case agent to the probation officer purportedly comes from Diggs's wife, and it is therefore protected by the spousal testimonial privilege and not properly before the Court at sentencing. While the Court determined earlier that there was a limited exception for the time period during which Defendant's spouse was allegedly part of the robbery conspiracy, the alleged purchase of body armor by a "confederate" pre-dated Defendant's wife's alleged participation in the conspiracy by several months as it apparently occurred in December 2016, several months before the robbery.

Second, even if the Court could properly consider it, the statement merely suggests that, many months in advance of the robbery, a passenger in Defendant's car got out of his car at a local gas station, met with another individual in a different car, and returned with what the witness believed to be a bulletproof vest. Even assuming that that passenger participated in the robbery, there is no evidence that the item retrieved by the passenger was in fact worn by him, or anyone else, during the robbery, or that it was a "product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire," as required by the guidelines and statute.

For all of these reasons, Defendant respectfully requests that the Court overrule the PSR's proposed body armor enhancement under § 3B1.5.

##### C. Corrected Advisory Guideline Range

The PSR calculates the initial advisory sentencing range as 121-151 months, which is based on an adjusted offense level of 31 and Criminal History Category II and derived using the erroneous abduction and body armor enhancements. Adding the mandatory consecutive 84 months required by the § 924(c) conviction results in a combined advisory sentencing range of 205-235 months, and the PSR recommends a sentence at the low-end of that advisory range. However, after removing the erroneous adjustments under §§ 2B3.1(b)(4)(A) and 3B1.5, the proper adjusted offense level under § 2B3.1 is 27 (rather than 31), which results in an advisory guideline range of 78-97 months. Combined with the mandatory 84-month consecutive sentence under § 924(c), the correctly computed combined low-end of the advisory guideline range is 162 months.

For the reasons set forth herein, counsel respectfully submits that a sentence substantially below that low-end of the properly computed advisory guideline range would be sufficient but not greater than necessary to effectuate the purposes of § 3553(a).

### III.  Analysis of the § 3553(a) Factors

As the Court is well aware, in determining an appropriate sentence under the facts of each individual case, the sentencing court must look to the factors set forth in 18 U.S.C. § 3553(a). The Supreme Court has described section 3553's parsimony provision—the instruction to "impose a sentence sufficient, but not greater than necessary," to accomplish the purposes of sentencing—as its "overarching" command. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Those purposes include the need

13

for the sentence imposed to reflect the seriousness of the offense, to afford adequate deterrence, to protect the public, and to provide the defendant with needed training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a)(2)(A)-(D).

Accordingly, section 3553(a) directs courts to consider, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the kinds of sentences available to effectuate the goals of sentencing. *Id.* at §§ 3553(a) (1), (3). "The statute does not weight the factors. That is left to the sentencing judge, within the bounds of reason, which are wide." *United States v. Johnson*, 471 F.3d 764, 766 (7th Cir. 2006). In all cases, the sentencing court "must make an individualized assessment based on the facts presented" to determine a sentence sufficient, but not greater than necessary, to achieve the statutory goals of sentencing. *United States v. Young*, 590 F.3d 467, 474 (7th Cir. 2010).

In this case, the relevant factors set forth in § 3553(a) call for a sentence substantially below the low end of the properly calculated advisory guideline range.

### A. Tobias's History and Characteristics

The attached letters, which are summarized above, make clear that Tobias is and always has been a kind and caring family member and friend. They establish that he was a talented athlete and artist with a warm and engaging spirit, and as a young child had the drive and potential to escape the difficult circumstances in which he grew up. Together with the PSR, however, these letters also establish that Tobias suffered unimaginable tragedy and hardship at a formative time in his development when his two oldest brothers were tragically shot and killed within the span of a year when Tobias was fourteen years old.

There can be no doubt that the trauma Tobias suffered at that time was intense, and that it had a profound impact on his development and the course of events that led him to engage in the violent acts that brought him before the Court. It started with truancy and abandonment of his football dreams and admission to a hospital for "behavior problems," and then progressed to drug use, gambling, criminal behavior, and violence.

None of this is said to excuse the acts Tobias committed, or the harm he caused. But the extraordinary trauma he suffered at a critical time in his life, and the troubling path that it produced, must inform how the Court views his history and characteristics, both for the purpose of judging his past conduct and gauging his potential for success upon release from prison.

At the time of the offense, Tobias was only 23. He had ever spent any substantial period of time in custody, and he had never had the luxury or opportunity to reflect and process his extraordinary loss, or to receive treatment for his resulting depression, anxiety, hallucinations, and addictions. As his family members attest, and as counsel has observed, there is ample reason to believe that after receiving appropriate counseling and treatment to address his foundational trauma and resulting afflictions (which he has never before been afforded), Tobias will depart prison with promising potential for a successful life as a supportive son, sibling, and father.

The extraordinary hardship that Tobias suffered as a teen, the path to self-destructive behaviors it unleased, and his relative youth at the time of the offense are all substantially mitigating factors that call for leniency. As is the innate talent,

15

potential, caring, and warmth to which Tobias's family members uniformly attest.

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Provide Adequate Deterrence and to Protect the Public

In considering the offense, three things are indisputably clear. The offense was serious, it requires serious punishment, and Tobias will, no matter the Court's decision, serve a lengthy prison sentence. The only question for the Court is how much lengthier and more punitive that significant prison term needs to be to satisfy the statutory purposes of sentencing as set forth in § 3553(a).

In considering that question, the Court should keep in mind that this case involves only a single robbery committed while Defendant was only 23 years-old, and he was just one of four people involved. A single robbery, even if armed and violent, is substantially less aggravated than a string of armed robberies occurring over the span of many months, but defendants in this district who engaged in such indisputably more aggravated conduct have received sentences well below the advisory sentencing range advanced in this case. (*See, e.g.,* Department of Justice press releases attached as Exhibit 3 (defendant who committed a string of nine armed robberies over several months sentenced to approximately 11 years); (defendant who committed 20 armed robberies during a five-month period sentenced to approximately 15 years).)

And judges in this district have also recognized that repetitive conduct far more depraved and harmful than that involved in the singular robbery in this case does not require the type of overly punitive sentence suggested by the advisory guidelines in this case. *See U.S. v. Misher* 14-Cr-107, ECF ##73, 85, 93 (defendant

16

who prostituted young teenagers by "recruit[ing] vulnerable children from his own neighborhood, suppl[ying] them with drugs and alcohol, indoctrinat[ing] them with his own set of rules, [selling] them like pieces of meat to any customer with cash" sentenced to 10 years in prison); *U.S. v. McKee*, 12-Cr-707, ECF #147, at 5; ## 163, 264 (defendants who prostituted young teenagers by "pump[ing] them with drugs and alcohol, threaten[ing them], and physically intimidat[ing] to keep them in line" sentenced to 102 months and 132 months).

Therefore, even putting aside Tobias's tragic personal circumstances, the nature of this singular armed robbery does not require or justify a sentence within the advisory guideline range set forth in the PSR. Nor can the mechanical application of the advisory guidelines justify such a sentence. As the Supreme Court and the Seventh Circuit have emphasized, the advisory guidelines range merely presents an "initial benchmark" for the appropriate sentence to be imposed upon the defendant based on the circumstances of each particular case. *See U.S. v. Pennington*, 667 F.3d 953, 958 (7th Cir. 2012) (citing *Gall v. U.S.*, 552 U.S. 38, 49 (2007)).

Judges in this district routinely recognize that, as in this case, the advisory guideline range often grossly overstates the length of a sentence that is "sufficient but not greater than necessary" to effectuate the purposes of sentencing under § 3553(a), and that is particularly true in cases involving the relevant robbery guideline provision here, § 2B3.1. Indeed, data from the U.S. Sentencing Commission, which is attached as Exhibit 4, reflects that more 70% of the defendants sentenced in this district over the past five years under § 2B3.1 have received a sentence below the advisory guideline range, and the average sentence under this robbery guideline

provision is approximately six years, dramatically below the low end of the advisory guideline range for Tobias.

Given Tobias's profound and formative hardship, his young age, and the singular nature of his offense conduct, there is no reason he should fall in the minority of defendants saddled with a sentence within the advisory guideline range or receive such a disproportionately punitive sentence. On the contrary, his personal circumstances, his age, and the singular nature of the offense warrant a sentence that is substantially below the advisory guidelines range.

**C.    The Need for the Sentence Imposed to Provide Educational and Correctional Treatment**

As noted above, before the offense, Tobias had never had the opportunity or resources to address and remedy the profound trauma and hardship he experienced as a teenager, or the mental health struggles and addictions that followed. Since his initial arrest in this case, Tobias has shown an interest in and desire to pursue such counseling and rehabilitative opportunities. He has sought out and participated in treatment for his gambling and drug addictions, and he has also taken educational classes and classes in parenting, anger management, cognitive thinking, and stress management. (PSR ¶¶ 107, 112, 116.)

The federal correctional system will surely be able to provide additional and valuable resources for Tobias when he is designated to a permanent facility, and there is ample reason to believe that Tobias will continue to take advantage of those resources and that he will emerge from prison as a mature and very different person than the 23-year-old who committed the offense. Indeed, as discussed above, family

members attest to "a kind hearted person with a very strong personality with the desire for self improvement." (Ex. 2, at 4.)

There is no reason to believe that a sentence anywhere near the low end of the advisory guideline range is needed to provide Tobias those opportunities, or to successfully address the underlying afflictions that brought him before the Court. In light of the mandatory sentence required under § 924(c), regardless of the sentence the Court imposes, Tobias will be decades removed from the underlying trauma when released from prison, and he will have had years and, for the first time, resources to process his trauma and to address and mitigate the inflictions and impulses that brought him before the Court.

### IV. Conclusion

WHEREFORE, for all of the reasons set forth above, Counsel respectfully submits that a sentence substantially below the low end of the properly calculated advisory guideline range is sufficient but greater than necessary to advance the purposes of § 3553(a), and requests that the Court impose such a sentence.

Respectfully Submitted,

/s/ *Douglas E. Whitney*
Douglas E. Whitney
DOUGLAS WHITNEY LAW
OFFICES LLC
321 N. Clark Street, Suite 1301
(P)  312-279-0510
(F)  312-277-6620
doug.whitney@dwlollc.com

*Attorney for Defendant Tobias Diggs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2022, in accordance with LR5.9 and Fed. R. Crim. P. 49(e), I electronically filed the foregoing DEFENDANT DIGGS'S SENTENCING MEMORANDUM with the Clerk of the Court using the CM/ECF system, which will send notification of such filing all counsel of record at their e-mail addresses on file with the Court.

*/s/ Douglas E. Whitney*
Douglas E. Whitney
