CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 22-1502

UNITED STATES OF AMERICA,

                                                     *Plaintiff-Appellee*,

*v.*

TOBIAS DIGGS,

                                                     *Defendant-Appellant*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cr-185-1 — **Gary Feinerman**, *Judge*.

_____

ARGUED JANUARY 10, 2023 — DECIDED SEPTEMBER 5, 2023

_____

Before SCUDDER, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges*.

KIRSCH, *Circuit Judge*. A jury convicted Tobias Diggs of armed robbery and other associated crimes after he and three others held up an Illinois jewelry store. Two evidentiary rulings form the basis of Diggs's appeal. First, Diggs argues that the district court should not have permitted his wife to testify against him. The district court concluded that she was a co-conspirator, so the spousal testimonial privilege did not

Case: 1:18-cr-00185 Document #: 353 Filed: 09/27/23 Page 2 of 18 PageID #:4752
Case: 22-1502     Document: 00714267249     Filed: 09/27/2023     Pages: 18

2                                                                No. 22-1502

apply. Second, Diggs argues that certain hearsay testimony from the case agent should have resulted in a mistrial. But any evidentiary error was harmless, and the district court did not abuse its discretion in refusing to grant a mistrial, so we affirm.

I

A jury found that Tobias Diggs and three others robbed the Razny Jewelers store in Hinsdale, Illinois, on March 17, 2017. At trial, the government's evidence established that when the store opened at 10 am, Diggs and two others exited a blue Lexus SUV bearing Michigan license plates. They entered the store with guns raised and equipped with handcuffs, sporting masks, and gloves. They quickly subdued and handcuffed the store's security guard and dragged a sales associate to a back room where they handcuffed and pistol-whipped her. One of the men encountered another sales associate, put a gun to her head, locked her in the bathroom, and told her he'd kill her if she tried to get out. A fourth man in the crew, Joshua McClellan, sat in the Lexus and listened to the robbery unfold on his cellphone before driving the men—and their haul of more than $400,000 in watches and jewelry—to temporary safety. Three days later, Diggs and McClellan drove from Chicago to Atlanta to liquidate their haul. They met with a jeweler—A.P. the Jeweler—who initially expressed interest but eventually demurred due to the asking price. After returning to Chicago, McClellan found a willing buyer.

Eventually, the law caught up with Diggs and McClellan. (Marvon Hamberlin and the fourth man remain at large.) A grand jury indicted the pair on charges of Hobbs Act robbery, conspiring to do the same, brandishing a firearm during a

No. 22-1502   3

crime of violence, and transporting stolen goods. Diggs and McClellan pleaded not guilty and were tried together. The jury convicted both men on all counts. Diggs preserved his two challenges, which we turn to now.

II

Before trial, Diggs informed the court that his wife, Devinn Adams (who was his girlfriend at the time of the robbery), would invoke the spousal testimonial privilege if called to testify. The district court denied the privilege on the grounds that Adams fell within the joint-participant exception. See *United States v. Clark*, 712 F.2d 299, 301 (7th Cir. 1983) (no spousal testimonial privilege when the defendant and spouse jointly participated in the criminal conduct). The district court found that the government's proffered evidence showed that Adams became a co-conspirator on the day of the robbery and only withdrew a few days later when she told police that Diggs had used her car for the robbery. The district court concluded that the joint participant exception deprived Adams of spousal testimonial privilege.

On appeal, Diggs argues that we should reconsider and reject our joint-participant exception to the spousal testimonial privilege. Failing that, Diggs contends that Adams wasn't a joint participant, so the district court erred by compelling her to testify.

We need not reach these arguments, however. Like all evidentiary objections, the district court's finding that Adams was a joint participant is subject to the harmless error standard. The government carries the burden of proving that an error was harmless, meaning that it did not affect a defendant's substantial rights. *United States v. Gomez*, 29 F.4th 915, 929 (7th

Cir. 2022). When considering a non-constitutional error like the one Diggs alleges, if we "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). In other words, we ask "whether an average juror would find the prosecution's case significantly less persuasive without the improper evidence." *United States v. Miller*, 673 F.3d 688, 701 (7th Cir. 2012). We consider the impact of the improperly admitted evidence on the minds of the jury, "not singled out and standing alone, but in relation to all else that happened." *Kotteakos*, 328 U.S. at 764. Here, after considering Adams's testimony (and its role in the government's case) in relation to "all else that happened" at trial, we are convinced that an average juror would not find the government's case significantly less persuasive without it.

A

Department of Homeland Security Special Agent Daniel Silk led the investigation into the robbery and offered ample testimony and evidence to support Diggs's guilt. He testified that in early 2017, McClellan's calls and text messages suggested that he and Diggs worked to surveil a robbery target and coordinate their activities. McClellan's phone records and Diggs's social media accounts, cell-site location information (CSLI), and toll records all linked Diggs to a cellphone number that had been activated a week before the robbery.

At trial, Diggs argued unsuccessfully that the phone number didn't belong to him, but the evidence that it did was overwhelming. Diggs sent a social media message asking someone to call him at that number. Diggs received a

No. 22-1502                                                                 5

Facebook message asking him to place a call, and toll records reflect the call was made from that number just minutes later. The contacts list on McClellan's phone associated the number with Diggs. Cell-site records showed that the number most frequently used the cell tower nearest to Diggs's home. Toll records showed dozens of text messages and calls to numbers associated with Diggs's family, his two girlfriends (Adams and another woman named Jessica Christian), McClellan, and an individual called Gold Mouth. On appeal, Diggs does not challenge that the phone number belonged to him.

Phone records from the day of the robbery revealed that Diggs, McClellan, and the two others were in contact 49 times. That morning, McClellan received two calls from a contact named Johnny. McClellan then made a short call to Diggs at 7 am. Around the same time, CSLI showed Diggs's phone connected to a tower in Matteson, Illinois. (CSLI is generated whenever a cell phone connects to a cell tower; by identifying which towers a phone connects to, law enforcement can approximate a phone's location with great precision. See *United States v. Lewis*, 38 F.4th 527, 536 (7th Cir. 2022).) Other evidence—including CSLI, phone records, and a marriage license—suggested that Diggs lived in Matteson. Ten minutes later, McClellan texted Johnny: "Bet. He on his way." Johnny called McClellan at 7:54 am, and McClellan called Diggs at 7:55 am. Less than 10 minutes later, McClellan texted Johnny: "We on our way." Several calls between Johnny and McClellan followed.

Shortly before the robbery, CSLI showed that Diggs and McClellan's phones connected to towers in Hinsdale. Diggs's phone pinged a tower a mile and a half from Razny Jewelers. A third phone, which connected to the same tower as Diggs's,

called Diggs's phone for about 25 minutes, covering the time of the robbery. The call ended just after the robbery ended. Surveillance footage from the jewelry store depicted one of the robbers holding a cell phone throughout the robbery. There was no call activity on the phones for the next three hours. Later that afternoon, Diggs's number contacted Adams's number seven times.

Jessica Christian, one of Diggs's girlfriends at the time of the robbery, also testified at trial. She said that she had seen Diggs drive a blue or silver Lexus with Michigan plates in March 2017 and that it belonged to Adams, his other girlfriend. Christian had been in the Lexus three times, and Diggs drove each time. Christian testified that on the day of the robbery, Diggs asked her if she wanted to use the Lexus, something she had never done before. She accepted and took the keys from Diggs. Christian then drove the car to a hospital where she worked. Video surveillance captured Christian parking the same Lexus that was used in the robbery in the hospital's parking lot. After work, Christian called Diggs to pick him up, Diggs did not answer the call, and Christian drove the Lexus directly to her home. She later asked Diggs whether he would pick up the Lexus, and he said he would. But Diggs never did, and law enforcement later found the Lexus in Christian's garage.

The day after the robbery, Gold Mouth called Adams at 2:43 pm and Diggs at 2:46 pm. That evening, Johnny and McClellan discussed plans to head out of town, and they talked about an individual they called A.P. the Jeweler. Just before midnight, McClellan texted Johnny that he thought they should bring "Bias"—a nickname for Diggs. Johnny

No. 22-1502                                                                 7

emphasized that they needed to leave as soon as possible that night (a Saturday) in order to cash out before Monday.

Later that night and in the early morning hours of the next day, cell phone evidence established that Diggs, McClellan, and Johnny drove from Chicago to Atlanta. CSLI established that Diggs's phone left Chicago around 2 am before connecting to various towers in Indiana, Kentucky, and Tennessee, before settling in Georgia. CSLI generated by McClellan's phone showed the same movement. Both phones eventually connected to the same tower near an Atlanta hotel that McClellan checked into on Sunday, March 19, and checked out of the next day.

A.P. the Jeweler testified that on March 19 he met with three to five individuals near McClellan's hotel. A.P. said he knew two of the individuals. One was the man who arranged the meeting; A.P knew him as "Nephew," but others called him "Gold Mouth." The other was "one of Nephew's boys." A.P. testified that he could not identify Diggs as one of the individuals he met with, but June 2016 photos found on Diggs's social media revealed that the two had met in the past. Phone records showed that Diggs and Gold Mouth had called each other 16 times between March 18 and March 20. A.P. testified that during the March 19 meeting, the individuals offered to sell him high end watches for around $100,000 to $200,000. He declined but took two photographs of the watches, which were admitted at trial. Razny Jewelers store manager testified that the watches in the photos matched those missing from its inventory. CSLI showed Diggs and McClellan traveled back from Atlanta to Chicago in the early hours of Monday, March 20.

B

After the district court found that she was a joint participant, Adams was granted immunity by the government and compelled to testify at trial. Adams testified that Diggs had her blue Lexus SUV with Michigan plates at the time of the robbery. She also said that Diggs had told her that "he had busted a J move or a J spot." Adams stated that Diggs told her that the car was "on the news" and asked her to come get it. She also testified that Diggs had called to tell her that he was going "out of town" or "south," which she understood to mean Atlanta.

Adams's testimony was damning, no doubt. After all, according to Adams's testimony, Diggs confessed to the robbery. And the government, recognizing the significant weight of her testimony, relied heavily on it at trial. The government framed its closing argument around the testimony, arguing the testimony was "super powerful." But the government also presented an overwhelming amount of completely independent incriminating evidence. Phone records and CSLI, for example, connected Diggs to his co-conspirators and the crime scene. Phone records revealed that Diggs, McClellan, and other participants had worked together to surveil possible robbery targets and coordinate their activities for several months before the robbery. They were in contact 49 times on the day of the robbery. Phone records and CSLI proved that Diggs and McClellan traveled to Hinsdale that morning and were near Razny Jewelers for the entire duration of the robbery. Phone records and surveillance footage from the jewelry store showed that the robbers used an open phone line with the getaway driver as a walkie-talkie system. Surveillance footage recorded the robbers fleeing in a blue Lexus SUV with

Michigan license plates. Diggs's girlfriend, Christian, testified that the Lexus belonged to Adams. Christian also told the jury that Diggs used that Lexus and recruited her to drive it after the robbery. That afternoon, she got the keys from Diggs and drove the Lexus home. Surveillance footage corroborated her testimony, and police later recovered the vehicle in her garage. The jury learned all of this without Adams's help.

As for the trip to Atlanta and back, phone records, hotel records, and CSLI all showed that Diggs and McClellan traveled to meet with A.P. the Jeweler the day after the robbery. A.P. testified that Gold Mouth set up the meeting. The meeting took place near McClellan and Diggs's hotel. A.P. testified that he met with three to five individuals, including one of Gold Mouth's "boys." Social media and phone records showed that Diggs knew both A.P. and Gold Mouth. And phone records showed that Diggs placed or received 16 calls to Gold Mouth between March 18 and 20, which covered Diggs's drive down to Atlanta, his meeting with A.P., and his return to Chicago. A.P. testified that the individuals offered to sell watches that were later identified as part of Razny's missing inventory. And CSLI showed that Diggs and McClellan traveled from Atlanta to Chicago the next morning.

With or without Adams's testimony, the government presented a case to the jury that overwhelmingly proved Diggs's guilt. The government's evidence made it clear beyond a reasonable doubt that Diggs was guilty notwithstanding Adams's testimony—the other evidence put Diggs squarely in the middle of the crime before, during, and after the robbery. We can thus say with fair assurance that the jury's verdict was not substantially swayed by any error. *Kotteakos*, 328 U.S. at

765. Thus, even if the district court erred in denying Adams the spousal testimonial privilege, the error was harmless.

III

Diggs challenges the district court's denial of a mistrial based on a portion of Agent Silk's testimony that was hearsay. We review the district court's denial for an abuse of discretion. *United States v. Graham*, 47 F.4th 561, 566 (7th Cir. 2022). "A defendant is only entitled to a new trial if there is a reasonable possibility that the evidence had a prejudicial effect upon the jury's verdict." *United States v. Harden*, 893 F.3d 434, 451–52 (7th Cir. 2018) (quoting *United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996)). In essence, our "inquiry is whether [the defendant] was deprived of a fair trial." *United States v. Lauderdale*, 571 F.3d 657, 661 (7th Cir. 2009).

During Diggs's cross-examination, Agent Silk testified that he started investigating the robbery after receiving information from a confidential informant, who was a friend of an individual named Jerry Francis. After Diggs completed his cross-examination, McClellan cross-examined Agent Silk about Francis:

> COUNSEL: Your investigation developed specific evidence that the day after the robbery, Jerry Francis was trying to sell proceeds from the robbery; is that true?
>
> SILK: Jerry Francis—there was a phone call that Jerry Francis was with Tobias Diggs to my informant.
>
> COUNSEL: Well, specifically, though, Jerry Francis Face-Timed your [confidential informant] with a bag of jewelry—

>   SILK: Correct.
>
>   COUNSEL: —that he stated was from the Razny robbery; is that true?
>
>   SILK: Yes.

The testimony that Agent Silk's informant was on a Facetime call with Francis and Diggs with a bag of Razny jewelry was undoubtedly hearsay, but Diggs did not object. Instead, once McClellan's cross-examination ended, Diggs moved for a mistrial, arguing that this part of Agent Silk's testimony was prejudicial hearsay. Diggs also argued he had been careful in his cross-examination to not elicit any hearsay from Agent Silk, and that Agent Silk could have responded to McClellan's question with a yes or no without further elaboration. As an alternative to a mistrial, Diggs requested that the court strike the testimony, advise the jury that Agent Silk's answer was improper, and instruct the jury to disregard any reference to Diggs during McClellan's entire cross-examination.

The district court agreed that the testimony constituted hearsay and implicated Diggs's rights under the Confrontation Clause, but denied both Diggs's motion for a mistrial and his request for a curative instruction. The district court reasoned that Diggs had forfeited his hearsay and Confrontation Clause objections: McClellan's question called for hearsay, and Diggs's counsel should have objected to it before or right after Agent Silk's answer. The district court also explained that Diggs repeatedly elicited hearsay about Francis when it was favorable to him. Having introduced the statements of the same unavailable declarant himself, the district court explained, Diggs could not then complain of a cross-

examination of the declarant's related statements on the same subject. Even if Diggs had not forfeited his objections, the district court concluded that a new trial was not warranted because there was no reasonable possibility that the hearsay testimony prejudiced Diggs.

On appeal, Diggs argues that he was careful not to elicit hearsay statements from the confidential informant during his own cross-examination of Agent Silk and that Agent Silk improperly elaborated on a yes or no question. Diggs asserts that McClellan's question did not require hearsay and that there was no reason Diggs could have known to object. Diggs also contends that the hearsay testimony was highly prejudicial because there was no other evidence that directly tied Diggs to the jewelry after it was stolen.

The district court did not abuse its discretion in denying Diggs's motion for a mistrial. Diggs should have objected to Agent Silk's hearsay answer once it was uttered. See *United States v. Swan*, 486 F.3d 260, 264 (7th Cir. 2007) (noting that an objection raised for the first time in a motion for a mistrial or new trial is not timely). A timely objection could have cured any prejudicial effect from that hearsay, but a curative instruction long after the offending testimony would have drawn more attention to the hearsay. And we agree with the district court that the testimony did not prejudice Diggs and was not critical to the government's case. After it was admitted, it was never mentioned again, and the other evidence tying Diggs to the robbery and stolen jewelry was overwhelming. Diggs was not denied a fair trial, so we find no abuse of discretion in the district court's decision to deny a mistrial.

AFFIRMED

No. 22-1502 13

SCUDDER, *Circuit Judge*, concurring. The majority opinion is well done, and I agree in full with the conclusion that any legal error in compelling Devinn Adams's testimony was harmless. I write separately to address the legal issue that the majority understandably leaves for another day—whether a witness who participates in their defendant-spouse's crime can invoke the spousal testimonial privilege and decline to testify. We answered that question no in 1974 in *United States v. Van Drunen*. 501 F.2d 1393, 1396–97. Since then, however, four other circuits have relied on the Supreme Court's 1980 decision in *Trammel v. United States*, 445 U.S. 40, to reach the opposite conclusion. A future case will require us to reconsider our position.

A

The beginning point is to recognize that there are two different evidentiary privileges for spouses. The first is the marital communications privilege, which allows any party to prevent their spouse (or ex-spouse) from testifying to certain confidential communications made between them during their marriage. See 1 Kenneth S. Broun et al., *McCormick on Evidence* §§ 78–86 (8th ed. 2022). A defendant-spouse can invoke the privilege even if their spouse would like to testify. See *id.* § 83; see also *United States v. Lea*, 249 F.3d 632, 641 (7th Cir. 2001). The marital communications privilege has no application here because Adams and Diggs were not yet married at the time Diggs told Adams that he participated in the robbery.

The second privilege—the spousal testimonial privilege—allows a witness to refuse to testify against their spouse in a criminal trial. See 1 Broun et al., *McCormick on Evidence* § 66.

The privilege may only be invoked by the testifying spouse: they alone decide whether to testify, regardless of the wishes of the defendant-spouse. See *Trammel*, 445 U.S. at 53. And when invoked, no testimony can be elicited from the testifying spouse on any topic. See 1 Broun et al., *McCormick on Evidence* §§ 66, 79; see also *United States v. Lofton*, 957 F.2d 476, 477 (7th Cir. 1992) (observing that the spousal testimonial privilege "applies to all testimony against a defendant-spouse, including testimony on nonconfidential matters and matters which occurred prior to the marriage"); but see *Van Drunen*, 501 F.2d at 1397 (stating that the privilege is inapplicable where testimony concerns "matters prior to the marriage"); *United States v. Clark*, 712 F.2d 299, 302 (7th Cir. 1983) (same).

In *Van Drunen* we imposed a significant limitation on this second privilege, restricting its application "to those cases where it makes the most sense, namely, where a spouse who is neither a victim nor a participant observes evidence of the other spouses's crimes." 501 F.2d at 1397. So when the district court concluded that Adams participated in her husband's criminal conduct, she was no longer able to invoke the spousal testimonial privilege. She had to testify against her husband. Diggs urges us to revisit *Van Drunen*'s recognition of this joint participant exception to the privilege.

B

In *Van Drunen* we offered two justifications for the exception. *First*, we worried that a defendant could "enlist the aid of his spouse in a criminal enterprise without fear that by recruiting an accomplice or coconspirator he is creating another potential witness." *Id.* at 1396. That concern made sense in a

pre-*Trammel* world where the defendant could invoke the privilege and prevent their spouse from testifying. *Second*, we assumed that, where both spouses jointly participated in a crime, the marriage between the two may no longer constitute "an important institution contributing to the rehabilitation of the defendant spouse." *Id.* at 1397.

Those rationales are difficult to square with the Supreme Court's decision in *Trammel*. Indeed, the facts of *Trammel* are not far off from what happened here. Otis Trammel tried to prevent his wife from voluntarily testifying against him about a heroin-smuggling scheme in which they had both participated. See 445 U.S. at 42–43. The trial court admitted Trammel's wife's testimony over his objection, and the Tenth Circuit affirmed, explaining that Trammel could not invoke the privilege because he had "jointly participated in a criminal conspiracy with his wife." *United States v. Trammel*, 583 F.2d 1166, 1169 (10th Cir. 1978), *aff'd on other grounds*, 445 U.S. 40.

The Supreme Court granted review to consider the future of the spousal testimonial privilege. See 445 U.S. at 41–42. Although the Court acknowledged contemporary criticisms of the privilege as antiquated and inhibiting a court's truth-seeking function, see *id.* at 44–45, 50 & n.11, it declined to abolish the privilege altogether. The privilege, the Court ultimately determined, "promotes sufficiently important interests to outweigh the need for probative evidence in the administration of criminal justice." *Id.* at 51, 53. Those interests include the protection of the "marriage, home, and family relationships" and "marital harmony." *Id.* at 48, 53.

Trammel's wife had chosen to testify against him. This kind of voluntary testimony, the Court reasoned, would not

impede society's interest in protecting family relationships and marital harmony. See *id.* at 52–53. In the end, then, the Court modified the spousal testimonial privilege "so that the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying." *Id.* at 53.

Soon after *Trammel* we revisited the joint participant exception, albeit in abbreviated terms, in *United States v. Clark*, 712 F.2d 299 (7th Cir. 1983). We concluded that *Trammel* did not affect the exception we recognized in *Van Drunen*. See *id.* at 301 & n.1. Indeed, we relied on and seemed to reinforce the same two justifications underpinning *Van Drunen*: a concern with rewarding criminals who bring their spouse into their wrongdoing and a belief that a marriage between joint participants in criminal conduct lacks rehabilitative value for the defendant-spouse. See *id.* at 301–02. It has now been forty years since we have examined the issue.

In the meantime, every other circuit to consider the issue post-*Trammel* has rejected the joint participant exception to the spousal testimonial privilege. See *United States v. Pineda-Mateo*, 905 F.3d 13, 21–26 (1st Cir. 2018); *In re Grand Jury Subpoena*, 755 F.2d 1022, 1025–28 (2d Cir. 1985), *vacated as moot*, 475 U.S. 133; *In re Grand Jury*, 633 F.2d 276, 277–80 (3d Cir. 1980) (*Malfitano*); *United States v. Ramos-Oseguera*, 120 F.3d 1028, 1042 (9th Cir. 1997), *overruled on other grounds*, 225 F.3d 1053. And every other circuit has relied on *Trammel* in reaching that conclusion. See, *e.g.*, *Grand Jury Subpoena*, 755 F.2d at 1026 ("[T]he Supreme Court's action in *Trammel* has some negative implications as regards the joint participant exception."). That leaves our court isolated on the short end of a lopsided circuit split.

As the other circuits have recognized, *Trammel* undermines, if not eliminates, our justifications for the joint participant exception. The Supreme Court's decision to vest the spousal testimonial privilege in the testifying spouse alone addresses our concern that a defendant could loop their spouse into criminal conduct and then prevent that spouse from taking the stand. See *Van Drunen*, 501 F.2d at 1396. After *Trammel*, "[a] person desiring to enlist the aid of his spouse as an accomplice cannot now be sure that he is not creating another potential witness; he takes the risk that the spouse may choose to testify." *Grand Jury Subpoena*, 755 F.2d at 1026.

Our second justification—that a marriage between joint participants in a crime is unlikely to aid in the rehabilitation of the defendant-spouse—likely misses the mark too. Rehabilitating the defendant-spouse was never a justification for the spousal testimonial privilege. See *id.* ("[R]ehabilitation ha[s] never been regarded as one of the interests served by the spousal privilege."). And I share the doubts expressed by our peer circuits about whether "courts can assess the social worthiness of particular marriages or the need of particular marriages for the protection of the marital privilege." *Malfitano*, 633 F.2d at 279.

More to it, the joint participant exception is not consistent with "the broader societal interest … in avoiding the perceived *unseemliness* of seeing a spouse being coerced to actively contribute to the prosecution of his or her spouse." *Pineda-Mateo*, 905 F.3d at 24–25 (emphasis in original); see also *id.* at 25 ("[P]iercing the spousal testimonial privilege necessarily involves *coercing* a non-defendant spouse to take the witness stand, face his or her spouse, and put the nails in the defendant spouse's proverbial coffin. Such a display

18 No. 22-1502

undoubtedly also raises the unseemly spectre that 'undermine[s] the marriage precisely in the manner that the privilege is designed to prevent.'" (emphasis and alteration in original) (quoting *Malfitano*, 633 F.2d at 279)).

To my eye, then, the joint participant exception is unlikely to withstand scrutiny after *Trammel* and against the backdrop of "reason and experience." Fed. R. Evid. 501. In the right case, we should revisit our precedent.